RICHARD E. REISER AND ELEANOR REISER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reiser v. Commissioner
Docket No. 20168-80.
United States Tax Court
T.C. Memo 1982-673; 1982 Tax Ct. Memo LEXIS 72; 45 T.C.M. (CCH) 163; T.C.M. (RIA) 82673; November 22, 1982. J. Jay Bullock, for the petitioners. Dan A. Lisonbee, *73 for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER: Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Year
Deficiency
1976
$7,277
1977
8,594
1978
8,429
The sole issue for our determination is the value of certain land which was donated to Brigham Young University in 1976 and which formed the basis of a charitable contribution deduction and carry-overs therefrom claimed by petitioners in the respective tax years. [1]
FINDINGS OF FACT
Some of the facts have been stipulated and are so found.The stipulations of fact, together with the exhibits attached thereto are incorporated herein by this reference. Richard E. and Eleanor Reiser (hereinafter "petitioners"), are husband and wife and resided in Pleasant Grove, Utah at the time they filed their petition herein. At all times relevant herein, petitioners owned *74 a 1/23 interest in the Manti-LaSal partnership (hereinafter "the partnership"). On or about August 1, 1972, Diversified Marketing, Inc. (hereinafter "DMI"), a real estate development corporation, purchased approximately 2,116.9 acres of land located east of Mount Pleasant, Utah (hereinafter "the Mount Pleasant property"). The price DMI paid for this land is not disclosed in the record. DMI undertook to subdivide the property and sell one-to-ten acre lots for recreational/residential purposes. Although it sold some lots, sales were apparently not brisk. By 1975, DMI began experiencing financial difficulties [2] and it became necessary for it to sell some of its properties in order to generate required cash. Sometime early in 1975 DMI placed the Mount Pleasant property on the market at a price somewhere between $300 and $400 per acre. However, no interested purchasers could be found at that time. Later in 1975, *75 the partnership entered into negotiations with DMI to purchase the Mount Pleasant property. Although DMI originally stated its asking price for the property as $350 per acre, this price was apparently unsatisfactory to the partnership. Through subsequent arm's length negotiations, the parties ultimately arrived at the mutually agreeable price of $125 per acre for the Mount Pleasant property. On December 15, 1975, the partnership entered into an agreement with DMI to purchase the Mount Pleasant property for a total purchase price of $250,000, with $15,000 payable on or before December 15, 1975 and the balance due within 60 days thereafter. However, pursuant to the agreement, the total purchase price was subject to adjustment according to the actual acreage transferred computed at a value of $125 per acre. Payment to DMI was made on the basis that 2,116.9 acres were actually conveyed at a price of $125 per acre.Title to the Mount Pleasant property was conveyed to the partnership by warranty deed dated March 15, 1976. This deed did not transfer mineral or water rights. No improvements were made to the Mount Pleasant property by the partnership.On December 21, 1976, by warranty *76 deed, the partnership transferred 1,599 acres of the Mount Pleasant property to Brigham Young University (hereinafter "B.Y.U.") by gift. (This 1,599 acre tract will hereinafter be referred to as "the subject property.") This deed did not convey water or mineral rights. B.Y.U. is an organization described in section 501(c)(3). [3]
The partnership determined that the value of the subject property at the time of its donation to B.Y.U. was $1,439,100, or $900 per acre. [4] Petitioners' distributive share of this contribution was computed as $62,570 (i.e., 1/23 of $1,439,100, rounded) and allocated to them accordingly. Petitioners claimed $21,591 of this amount as a charitable contribution deduction on their 1976 return. They additionally carried over a portion of the unused deduction to their subsequent tax years and accordingly claimed charitable contribution deductions in the respective amounts of $20,201 and $19,848 in 1977 and 1978. *77 In his statutory notice of deficiency, respondent determined that the fair market value of the subject property on December 21, 1976 was $128,000, or approximately $80 per acre. Accordingly, respondent computed petitioners' distributive share of the charitable deduction as $5,565 (i.e., 1/23 of $128,000). Thus, all of the amounts claimed by petitioners as charitable contribution deductions on account of the gift of the subject property to B.Y.U. on their 1976, 1977 and 1978 returns, except for $5,565 claimed in 1976, were disallowed in the notice of deficiency. The subject property is located in Central Utah, within five miles east of the town of Mount Pleasant in the county of Sanpete. Mount Pleasant is approximately 75 miles south of Provo, Utah and approximately 120 miles south of Salt Lake City, Utah. Sanpete County is a sparsely populated and rural area and the population of Mount Pleasant was between 1,500 and 2,700 in 1976. The property consists of 1,599 generally undeveloped acres, situated in five irregular-shaped parcels, and can be divided into two distinct topographical sections. The western-most parcels, comprising about 60 acres of the overall 1,599 acres, *78 are located in the foothills of a mountain range and have an elevation of about 6,400 feet. These acres generally have a moderate western slope, clay or rocky soil and cover including native grasses, lowlying herbs, sage, oak, pinion, juniper, and some willow types. Irrigation water is available to these acres, and they are adaptable to farming use. The eastern parcels generally consist of land extending into the mountain range itself, with highest peaks reaching in excess of 10,000 feet. This mountainous land comprises about 1,539 acres and lies adjacent to the western boundry of the Manti-La Sal National Forest. In fact, a portion of one of the parcels lies within the Forest's boundary. These higher elevations generally have a steep slope and are not generally adaptable to farming use. Conifer and aspen trees are present on the north slopes. Sanpete County had no zoning ordinance in effect on December 21, 1976. However, a very broad subdivision ordinance was in effect on that date which effectively vested the county with sole discretion to grant or deny a subdivision request. When the subject property was donated to B.Y.U., Sanpete County officials were hostile toward *79 allowing subdivision of this land in parcels smaller than 20 to 40 acres. The mountain portion of the subject property is partly accessible on or from a two-lane graveled road and other interior mountain roads which are graded and in only fair condition. The latter interior roadways are not accessible in winter. On December 21, 1976, electric power was available to the lower 60 acres of the subject property. No electric power was available to the parcels located in the upper elevations. Potable water was not available to any of the parcels of the subject property, although three streams which ran through the property could potentially be adapted to potable use. The highest and best use of the subject property is for recreational purposes, with interim seasonal grazing. At December 21, 1976, the fair market value of the subject property was $300 per acre as to the lower or western portion (60 acres) of the tract, and $150 per acre for the remainder of 1,539 acres, or a total value of $248,850. OPINION
Section 170 allows an individual a deduction for charitable contributions subject to certain percentage limitations. Any excess contributions may be carried over to *80 an individual's subsequent years. See section 170(b) and (d). If a charitable contribution is in property other than money, the amount of the contribution is the fair market value of the property on the date the contribution is made. Section 1.170 A-1(c)(1), Income Tax Regs. For these purposes, fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having a reasonable knowledge of relevant facts." Section 1.170 A-1(c)(2), Income Tax Regs. The parties herein agree that a charitable contribution was made of the subject property on December 21, 1976, and that petitioners are entitled to a charitable contribution deduction in the amount of 1/23 of the fair market value of the property on the contribution date. The only issue for decision is the fair market value of the subject property on December 21, 1976. Respondent's determination of fair market value is presumptively correct and petitioners bear the burden of proving it arbitrary or erroneous. , Rule 142(a). Petitioners' expert witness, *81 John K. Bushnell, has been engaged in the appraising profession for approximately 21 years. He has completed classes at the American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers, and received his M.A.I. designation from the former organization in November, 1975. Based upon an appraisal that Mr. Bushnell made of the subject property, [5] he determined that the fair market value on December 21, 1976, to be a total of $559,650 or $350 per acre. Respondent's expert witness, Gregory E. Austin, has been engaged in the real estate business for approximately 38 years. He is the owner and manager of the Gregory E. Austin Company -- Real Estate Appraising *82 and Brokerage. He has been an instructor and guest lecturer on the subject of real estate appraising, is a certified M.A.I., and is a senior member of the Society of Real Estate Appraisers. Mr. Austin appraised the subject property on January 15, 1982, and concluded that its fair market value as of December 21, 1976, was $195,000 (rounded). Mr. Austin's conclusion was based on his determination that the value of 60 acres of the subject property located in the foothills of the mountain range was $300 per acre, while the value of the remaining acreage (i.e., 1,539 acres) was $115 per acre. Both petitioners and respondent have refined their respective positions with respect to the value of the subject property (as compared to their original positions in the petition and statutory notice, respectively) and argue that the valuation determined by their respective expert witnesses is correct. The experts for each party utilized the market data approach in reaching their respective conclusions. The market value approach is an appraisal procedure whereby the fair market value of a specific piece of property is estimated by analyzing actual sales of similar property. Petitioners' *83 expert witness, Mr. Bushnell, examined six "comparable sales" which took place between January, 1972, and early 1974. Three of the parcels considered by Mr. Bushnell are located only about 30 miles east of Salt Lake City. One parcel is located in Sevier County, which lies to the south of Sanpete County, and more remote from major population centers. Only one parcel is located in the general vicinity of the subject property in Sanpete County. These parcels ranged in size from 60 to 4,500 acres, and ranged in price from $70 to $1,000 per acre. Respondent's witness, Mr. Austin, examined twelve "comparable sales" which took place between February, 1975, and the spring of 1979. Seven of the parcels are located in Sanpete County. The remaining parcels are located in Utah County, adjoining Sanpete County to the north. These parcels ranged in size from 190 to 3,300 acres and ranged in price from $80 to $400 per acre. After carefully reviewing the testimony and reports of both expert witnesses, as well as all of the other evidence presented in this case, we have found the valuations of both experts to be less than perfect. As to petitioners' expert, we are unconvinced that Mr. Bushnell *84 has accurately valued the subject property. He has not adequately explained why the fair market value of the subject property was as high as $350 per acre only one year after the partnership purchased the land for $125 per acre. The comparables used in his report were generally significantly different in size, location, and date of sale than that of the subject property and the sales prices of these comparables were not adequately adjusted to reflect these variances. Additionally, Mr. Bushnell valued the subject property uniformly at $350 per acre despite the fact the property consisted of two topographically distinct types of terrain. The western parcels were relatively flat, accessible tracts; while the eastern parcels generally consisted of rugged mountain terrain which was accessible only seasonally. Moreover, since Mr. Bushnell is himself engaged in developing property of the type here involved, we believe that his valuation of the subject property was more reflective of his overly-optimistic perspective of the market, rather than a more objective and distinterested appraisal of market conditions as they actually existed on December 21, 1976. Having said this, however, we *85 think petitioners have made a convincing showing that there was an element of distress sale in the purchase of the property by Manti-LaSal from DMI. On December, 1975, the latter firm was in financial trouble, and had to raise cash to stay afloat. The testimony, which we find credible, was that Manti-LaSal took advantage of this situation, drove a hard bargain, and got the property at something less than its fair market value at that time. We have taken this factor into consideration in arriving at our ultimate findings of value. At the same time, we did not find the testimony and report of respondent's expert witness completely satisfactory. In particular we think that Mr. Austin was overly conservative in his value estimate of the mountain acreage of the subject property, in light of the evidence provided in his own report regarding sales of similar property, which we found to be more truly comparable, generally, to the subject property than the comparables used by petitioner's expert. It would serve no useful purpose to make a detailed analysis of the testimony of both expert witnesses and their respective appraisal reports and set out, point by point, the extent to which *86 we agree or disagree with their analysis. The valuation process is not a precise science and the ultimate conclusion to be reached is purely one of fact. Cf. .[6] Moreover, we have on several occasions made clear that the settlement process is the preferred vehicle for disposing of disputes such as this because a valuation is "inherently imprecise and capable of resolution only by Solomon-like pronouncement." See ; . [7]
We have closely studied all of the evidence in the record, and it is our best judgment, on the entire record, that the value of the lower 60 acres of the subject property was $18,000 (i.e., $300 per acre) on December 21, 1976. The value of the remaining 1,539 acres of the subject property on December 21, 1976, was $230,850 (i.e., $150 per acre). Thus, *87 the total value of the subject property was $248,850 on December 21, 1976, and we have so found. Petitioners' charitable contribution deduction in respect of the gift to B.Y.U. is accordingly 1/23 of that amount, or $10,819.57, which may be deducted for the year 1976 as provided in section 170, subject to the 30 percent limitations of section 170(b) and the carryover provisions of section 170(d). Decision will be entered under Rule 155.
Footnotes
1. Additional adjustments were made in the statutory notice which increased petitioners' allowable itemized deduction for sales tax for the respective tax years. These adjustments are, of course, not disputed by petitioners since they are beneficial to them.↩
2. The record does not clearly disclose the extent of DMI's financial difficulties in 1975. It is clear, however, that by 1976 these difficulties became significant since DMI was involuntarily dissolved on September 30, 1976 by the Secretary of State of Utah.↩
3. All statutory references herein are to the Internal Revenue Code of 1954 as in effect during the years in issue. All references to rules are to the Tax Court Rules of Practice and Procedure.↩
4. According to the testimony of one of petitioners' witnesses, this value was based on three independent appraisals. However, none of these purported appraisals have been offered into evidence by petitioners.↩
5. Mr. Bushnell had originally appraised the Mount Pleasant property on October 28, 1975 at the request of Dwayne Watson, the president of DMI.This appraisal applied to the overall parcel owned by DMI at that time, of which the subject property was only a part, and resulted in a value of $350 per acre. On February 17, 1982, at the request of petitioners' counsel herein, Mr. Bushnell reviewed his original appraisal and concluded that the subject proprty was also worth $350 per acre on December 21, 1976.↩
6. See also . ↩
7. See also .↩